IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICAEL C.-D. Jr.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | )    No. 19 C 5417 |
| v. | ) |
| | )    Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[2] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[3]

Before the Court are Plaintiff Micael C.-D. Jr.'s motion to remand the Administrative Law Judge's ("ALJ") opinion denying his application for Social Security disability benefits[4] (D.E. 8) and the Commissioner's cross motion to affirm the opinion. (D.E. 19.)

---

[1] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On October 16, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 6.)

[4] The Appeals Council subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

I.   Background

Plaintiff applied for Social Security disability benefits in September 2016, at age 19. (R. 33.) At age 12, he was diagnosed with peripheral neuropathy (weakness, numbness, and pain from nerve damage) in his feet, which affected his strength and gait; his nerve pain was mostly controlled with Lyrica. (R. 477-79, 485.) The following year, Plaintiff began using a wheelchair for long outings. (R. 520.) In 2011, neurological exams showed weakness in his extremities, significantly decreased vibratory sense at his knees, and a stiff-legged gait. (R. 514.) Notes from a chronic pain clinic indicated Plaintiff was taking gabapentin (nerve pain medication), ibuprofen and tramadol (narcotic) for pain. (R. 511.) By December 2011, Plaintiff was using a wheelchair about once a month, when he was having a bad pain day or when he had to stand or walk for long periods of time. (R. 507.) In addition to taking pain medication, Plaintiff attended physical therapy in 2012 to help address his gait abnormalities, muscle weakness and limited range of motion ("ROM"). (R. 797-98.) In July 2012, Plaintiff reported that his pain was under control with medication; he was able to keep up with his peers but had to stop early sometimes due to pain. (R. 832.) Medical reports from 2013 noted that tramadol's sedative effect might have contributed to Plaintiff's poor performance in high school. (R. 878.) In November 2013, Plaintiff had pain in his right hand (R. 925), and he was prescribed glasses for blurred vision in his left eye. (R. 920.)

In August 2014, Plaintiff told his pain management doctor that he had no pain in his feet despite running out of tramadol.[5] (R. 955.) He could not remember which foot typically hurt, and his ambulation was within normal limits. (*Id*.) Plaintiff was advised to continue taking gabapentin, Cymbalta (nerve pain medication) and tramadol and to use Lidoderm (an adhesive patch to relieve pain) as needed. (*Id*.) In spring 2015, during his senior year of high school, Plaintiff reported an

---

[5] There was no mention of hand pain at this visit.

episode when his heart raced for a few minutes after normal activity; his physician was not concerned from a cardiac perspective, despite noting a "mildly myxomatous mitral valve."[6] (R. 968, 970.) Plaintiff graduated high school in May 2015, earning mostly Ds; his academic ability was described as in the "below average range." (R. 433, 435, 438.)

In August 2015, at a visit with his pediatrician, Plaintiff's neurological and physical examinations were normal, including full muscle strength, no sensory or motor deficits, and symmetric gait. (R. 1731.) At a visit with the pain management clinic, Plaintiff reported that he was doing very well with his pain medication and did not have any current pain symptoms; his medications were listed as amitriptyline (for nerve pain), gabapentin, Lidoderm and tramadol. (R. 1421.) That month Plaintiff also received a new prescription for eyeglasses for 20/40 vision in his right eye and 20/60 vision in his left eye. (R. 1766.)

In October 2016, Plaintiff filled out a function report in connection with his disability application. He wrote that pain in his feet made it hard for him to bend, kneel, climb stairs and stand for long periods of time, and pain in his hands (like pins and needles) made it hard for him to lift more than 10 pounds. (R. 266-68, 271.) It took him a while to complete his chores, which included cleaning the kitchen table, washing dishes, and cleaning his room. (R. 268.) Plaintiff wrote that he used a wheelchair and glasses when needed. (R. 272.)

On December 3, 2016, state agency consultant Efesomwan Aisien, M.D., conducted a 30-minute examination and interview of Plaintiff. (R. 468.) Plaintiff had no trouble squatting, standing on one foot, getting on and off the exam table and walking greater than 50 feet without support, but his gait was "spastic without the use of assistive devices" and he was unable to toe/heel walk.

---

[6] Myxomatous mitral valve disease is a type of heart valve disease where the flaps of the mitral valve are floppy. This "[u]sually . . . isn't life-threatening and doesn't require treatment or lifestyle changes." https://www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/symptoms-causes/syc-20355446.

(R. 469-70.) Plaintiff was able to grip, grasp, and manipulate normally with both hands, and ROM of his shoulders, elbows and wrists was normal. (R. 470.) ROM was reduced in his hips, knees, ankles and lumbar spine, and he had sensory deficits in his lower extremities; however, Plaintiff had full strength and the Romberg test (measuring balance) was negative. (*Id*.)

In December 2016, Plaintiff established care with an adult doctor. Examination showed tenderness to palpation in his lower back, hands and feet, but no sensory deficits, full muscle strength in all extremities, negative Romberg test, symmetric gait and normal deep tendon reflexes. (R. 1729.) The doctor prescribed Lidoderm, tramadol, gabapentin and Cymbalta. (R. 1728.)

On December 19, 2016, a non-examining state agency doctor opined that Plaintiff could perform light work (occasionally lift up to 20 pounds, frequently lift 10 pounds and stand and walk or sit six hours in an eight-hour day). (R. 130-34.) In May 2017, on reconsideration, another non-examining agency doctor opined Plaintiff was limited to sedentary work (standing or walking two hours total in an eight-hour day). (R. 142-44.)

## II.      Hearing Testimony

On May 3, 2018, Plaintiff testified that he usually spent 22 hours a day laying down in his room because he had severe foot/leg pain and his pain medication made him tired; he fell once a week due to weakness in his legs. (R. 88, 95-96, 99, 105.) Plaintiff watched television or listened to music in his room; he could not play video games due to pain in his hands. (R. 87-88, 115-19.) Plaintiff stated that he had not done the chores listed on his function report since his pain worsened in high school. (R. 90-91, 104.) Plaintiff testified that he could only stand for two minutes and used a wheelchair or walker when out in public, but he did not bring an assistive device to the hearing; Plaintiff said his mother had helped him walk that day. (R. 100-03.) Plaintiff also stated that his heart raced, he was frequently short of breath, and his left eye was blurry. (R. 124.) He last

saw an eye doctor two or three years ago, and he did not wear his prescribed glasses regularly (including at the hearing) because they did not help him see better. (R. 86-87.)

Plaintiff stated that "it's been a while" since he saw a doctor because of "the whole insurance thing and stuff" and because he had "to get a new doctor now that [he's] older." (R. 91.) In response to the ALJ's question as to why he had not found a new doctor despite being in so much pain that he stayed in his room all day, Plaintiff stated that he had "been going through this since [he] was little" and he was "kind of used to the pain" and the pain medication and how it made him feel, "so [he] just [didn't] know what more are they going to tell [him] or do for [him]." (R. 92-93.) He answered "yes," that he was resigned to staying in his room 22 hours a day. (R. 93.)

The ALJ asked the vocational expert ("VE") to opine on the jobs available to a hypothetical person who could do light work, except he could only stand and/or walk two hours during the day; occasionally climb ramps, stairs, ladders, ropes and scaffolds; frequently use both hands to handle and finger; and had to avoid concentrated exposure to unprotected heights and moving mechanical parts, working on uneven ground, and driving. (R. 121.) In addition, the hypothetical person was limited to simple and routine work and needed verbal instructions. (*Id*.) The VE stated that standing and walking only two hours a day meant sedentary jobs, which were available in significant numbers, with at most one absence per month and 15 percent off-task time per day. (R. 122-23.)[7]

## III.   ALJ Opinion

On September 19, 2018, the ALJ issued an opinion finding that Plaintiff had not been under a disability since the date his application was filed. (R. 26.) The ALJ found Plaintiff had severe degenerative joint disease and peripheral neuropathy but that despite having been diagnosed with a learning disability and vision loss, "there [was] insufficient evidence that these impairments

---

[7] Two days after the hearing, Plaintiff had an eye exam, which recorded 20/70 vision in his right eye and 20/100 vision in his left. (R. 1755.) The ALJ considered this evidence.

5

cause functional limitations" – specifically, Plaintiff's testimony that he did not wear glasses and the lack of recent evidence that he had deficits in cognition, memory or learning – and thus, they were not severe. (R. 27-28.) The ALJ determined that Plaintiff's impairments did not meet or equal the severity of a Listing, and she assigned him an RFC to perform light work, but limited to standing and walking two hours of the day, simple and routine work, frequent handling and fingering, and oral as opposed to written instructions.[8] (R. 28.)

The ALJ reviewed the evidence and found Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms [were] inconsistent due to multiple factors" (R. 30), including:

- He made "only a handful of visits to treating clinicians of any kind after the application date." (*Id.*)

- The evidence showed that "medications largely worked to address his pain, and while he has alleged constant and debilitating pain, there are no visits to urgent care or emergency room facilities." (*Id.*)

- "He asserted that he has vision problems but was uncertain whether this is really a problem, noting that glasses did not help." (*Id.*)

- "He alleged that he used a wheelchair when he goes 'out' but was unable to offer any insight on what he meant by 'out.'" (*Id.*)

- Plaintiff was "vague in describing his activities on a day to day basis," and "he commonly qualified his testimony with words such as 'I don't know' and similar imprecise comments." (*Id.*)

- "He was unable to say that he did much other than lie in his room for 22 of 24 hours out of a day. This testimony stands in stark contrast to assertions from his 2016 Function Report, in which he noted he could cook, clean, care for himself, socialize and shop at times." (*Id.*)

---

[8] Although neither party raises the issue, the Court notes that the ALJ erroneously referred to the RFC as "light work" even though the limitation to standing or walking two hours a day meant sedentary work. *See* 20 C.F.R. § 404.1567(b) (light work generally "requires a good deal of walking or standing"). This error in terminology was harmless because at Step 5 of the Social Security sequential evaluation, the ALJ relied on the VE's testimony that a significant number of sedentary jobs existed in the national economy. (R. 33-34.)

6

The ALJ concluded that "[a] comparison of his testimony with these Function Report answers and the limited objective record strongly indicate that [Plaintiff] exaggerated his deficits and attempted to portray his condition as worse than it is," and that his "allegation that he must lie down and nap daily is a personal lifestyle choice and is not necessitated by any impairment, prescribed medication, or a recommendation from a clinician." (*Id*.) The ALJ considered Plaintiff's "alleged inability to afford the prescribed treatment for his neuropathy," but "nonetheless" found him "not disabled" because he "was unable to explain why he does not have insurance coverage and has not shown that all possible resources . . . have been explored." (*Id*.)

The ALJ determined that the state agency opinion limiting Plaintiff to two hours of standing and walking was "supported by indications that the claimant continued to have pain with walking, exhibited tenderness on exam, and required use of a wheelchair for long distances." (R. 32.) However, the ALJ found that evidence from the hearing warranted additional environmental, manipulative, and communicative limitations. (*Id*.) The ALJ noted that "there are no contrary treating source opinion statements to consider and weigh," and "[f]urther restriction is unwarranted as the claimant had a very limited course of care with little evidence of objective deficits, [and] the claimant's subjective complaints are not fully reliable." (R. 32-33.) Finally, relying on the VE's testimony that an individual with Plaintiff's limitations could perform a significant number of sedentary, unskilled occupations, the ALJ concluded that Plaintiff was not disabled. (R. 33-34.)

IV.    **Analysis**

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, "[w]e will not reweigh

7

the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Plaintiff offers a host of conclusory and undeveloped arguments, but they all boil down to his contention that "[t]he ALJ does not cite to any substantial evidence to prove that the Plaintiff's complaints and symptoms were not credible." (Pl.'s Mot. at 4.) The Court disagrees.

      **A.**    **Legal Standard on Credibility Determinations**

To determine the credibility of a claimant's allegations, the ALJ should consider factors including "objective medical evidence of the claimant's impairments and treatment," "a claimant's treatment history," *Deborah M. v. Saul*, 994 F.3d 785, 789-90 (7th Cir. 2021), and "any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020). "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022).

      **B.**    **Dr. Aisien Did Not Give a Medical Opinion and Was Not a Treating Physician.**

Much of Plaintiff's argument as to why the ALJ's credibility determination was not supported by substantial evidence is based on the erroneous presumption that ALJ needed to give some, if not controlling, weight to Dr. Aisien's "opinion." But the non-examining state agency doctors were the only medical opinions in the record, and the ALJ properly considered and assigned weight to them. By contrast, Dr. Aisien was a consultative examiner who did not give an opinion to which the ALJ could have assigned weight. Instead, as the ALJ recognized, Dr. Aisien conducted a one-time examination of Plaintiff for the state agency and recorded his findings, which the ALJ appropriately considered. (R. 31.) His report does not constitute a "medical opinion," which is defined in the Social Security regulations as a "statement[] from acceptable medical

8

sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). Dr. Aisien did not offer any judgment about the nature and severity of Plaintiff's impairments, or about what Plaintiff could still do despite the impairments; in other words, he did not issue a medical opinion. *See Kelham v. Berryhill*, 751 F. App'x 919, 922 (7th Cir. 2018) (holding that the ALJ committed no error in considering the results of consultative examiners' findings where consultative examiners "did not comment on the significance of these findings" nor render an "opinion" on whether those findings "cause[d] any specific restrictions"). Furthermore, contrary to Plaintiff's argument, Dr. Aisen did not "diagnose" him with poor eyesight. Dr. Aisen did not conduct any testing on Plaintiff's vision, but "merely record[ed] and report[ed] what [Plaintiff] told him." *Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021) (holding that the ALJ does not owe deference to a medical opinion "based solely on the claimant's subjective complaints.")[9]

### C. The ALJ's Determination that Plaintiff's Testimony Was Exaggerated and Inconsistent with the Record Was Supported by Substantial Evidence.

#### 1. Plaintiff's Pain-Related Impairments

Beyond erroneously arguing that the ALJ should have given "great deference" to Dr. Aisen's "opinion," Plaintiff argues that the ALJ should have deferred to the doctor's diagnosis of neuropathy, which was consistent with those given by "Plaintiff's treating doctors . . . over the years." (Pl.'s Mot. at 4-5.) But the ALJ *agreed* that Plaintiff had severe degenerative joint disease and peripheral neuropathy (R. 27); she just did not find credible Plaintiff's allegations that his pain

---

[9] On a related note, Plaintiff's claim that the ALJ erred in failing to consider a report from Plaintiff's so-called "eye specialist" on November 9, 2018, is absurd. As the Appeals Council explained, that testing did not take place until after the ALJ issued her decision and thus does not apply to the period at issue. (R. 2.)

from these conditions was disabling. *See McGillem v. Kijakazi*, No. 20-2912, 2022 WL 385175, at *4 (7th Cir. Feb. 8, 2022) ("Medical evidence supports the existence of the condition, but the need for restrictions cannot be inferred from the diagnosis alone.")

The ALJ supported this credibility determination with substantial evidence. First, the ALJ reviewed the record and determined that the "medications largely worked to address [Plaintiff's] pain," because "while he has alleged constant and debilitating pain, there are no visits to urgent care or emergency room facilities," and he made "only a handful of visits to treating clinicians of any kind after the application date." (R. 30.) "Substantial evidence supports the ALJ's finding that pain medications enabled [Plaintiff] to manage her pain well enough to perform . . . work, subject to the restrictions the ALJ set out in the RFC assessment." *Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022). The ALJ properly relied on Plaintiff's "infrequent treatment or failure to follow a treatment plan" to support her adverse credibility finding because, contrary to Plaintiff's contentions (Pl.'s Mot. at 4), the ALJ "explored [Plaintiff's] explanations as to the lack of medical care," and determined that he "d[id] not have a good reason for the failure or infrequency of treatment." *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (quoting *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)). The ALJ rejected Plaintiff's explanation for his lack of treatment because he "was unable to explain why he does not have insurance coverage and has not shown that all possible resources . . . have been explored." (R. 30.)

Second, the ALJ questioned the extent of Plaintiff's need for a wheelchair because he "was unable to offer any insight on what he meant by [using a wheelchair when he goes] 'out'" and he did not appear at the hearing with a wheelchair. (R. 29-30.) This, too, was a valid basis upon which to discount Plaintiff's testimony. *See Zoch*, 981 F.3d at 601 (holding that the ALJ permissibly

10

discounted the claimant's testimony that she usually walked with a cane where most doctors' reports noted that she walked normally without one.)

Third, the ALJ properly discounted Plaintiff's "hearing testimony that [he] could not perform the usual activities of daily living," because that testimony "was inconsistent with [his] own prior assertions" in the function report he submitted as part of his Social Security application. *Id*. The ALJ found that Plaintiff was suspiciously "vague in describing his activities on a day to day basis," and "[h]e was unable to say that he did much other than lie in his room for 22 of 24 hours out of a day," which was "in stark contrast to assertions from his 2016 Function Report, in which he noted he could cook, clean, care for himself, socialize and shop at times." (R. 30.)

Essentially, Plaintiff's arguments appear to misunderstand the rule that "[a] claimant's assertions of pain, taken alone, are not conclusive of a disability." *Zoch*, 981 F.3d at 601. The ALJ here gave abundant "specific reasons supported by the record" showing that her credibility determination was not "patently wrong." *Grotts*, 27 F.4th at 1279.

## 2. Plaintiff's Other Alleged Impairments

Plaintiff also argues that the ALJ was wrong to find his allegations of severe and disabling vision and learning impairments unreliable.[10] (Pl.'s Mot. at 4-5.)[11] But, again, the ALJ gave ample "specific reasons supported by the record" to support her determination. *Grotts*, 27 F.4th at 1279. The ALJ reviewed the scant evidence of Plaintiff's vision problems and supported her determination that his allegations of severe visual limitations were not credible with substantial

---

[10] In addition, Plaintiff again mistakenly argues that the ALJ should have given more weight to Dr. Aisen's "diagnos[is]" of poor eyesight and a November 2018 medical report.

[11] Plaintiff also made passing reference to "cardiac issues" and "spasms in both hands." (Pl.'s Mot. at 2-3.) The ALJ acknowledged Plaintiff's testimony on these issues, but "[t]he record lacked evidence of [any related] limitations, except for [Plaintiff's] testimony, which the ALJ reasonably found unreliable." *Zoch*, 981 F.3d at 602-03. Moreover, such "[p]erfunctory and undeveloped arguments are waived." *Krell v. Saul*, 931 F.3d 582, 587 n.1 (7th Cir. 2019) (citations and quotations omitted).

evidence. The ALJ explained that there was no evidence that his vision problems caused functional limitations, and Plaintiff did not even wear his glasses. (R. 27-28, 30.) Likewise, the ALJ reviewed the evidence in the record of Plaintiff's learning problems, including the fact that he had an IEP (individualized education plan) in school, and supported her determination that his allegations of a severe learning impairment were not credible with substantial evidence. (R. 28.) Specifically, the ALJ noted that there was no recent evidence that Plaintiff had deficits in cognition, memory or learning (R. 27-28), and the ALJ pointed to school records showing that Plaintiff did "fairly well" and functioned "at a reasonable level" with services for a learning disability. (R. 31.)

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 8) and grants the Commissioner's motion to affirm (D.E. 19).[12]

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: June 8, 2022**

---

[12] Plaintiff's reply brief appeared to raise a host of new arguments. (D.E. 26.) The Court agrees with Defendant's contention that Plaintiff waived any arguments he raised for the first time in his reply brief. (D.E. 28: Def.'s Sur-reply.) However, for the most part, Plaintiff repeated the same arguments with more citations to the record.